Filed 3/11/14  P. v. Hernandez CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ULISES HERNANDEZ et al.,<br><br>    Defendants and Appellants. | G049320<br><br>(Super. Ct. No. FSB901919)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of San Bernardino County, Bryan Foster, Judge.  Affirmed in part, reversed in part, and remanded for resentencing.

Doris M. LeRoy, under appointment by the Court of Appeal, for Defendant and Appellant Ulises Hernandez.

Edward J. Haggerty, under appointment by the Court of Appeal, for Defendant and Appellant Frank Rodriguez.

Nancy L. Tetreault, under appointment by the Court of Appeal, for Defendant and Appellant Eddie Florentino.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina, Melissa Mandel and Annie Fraser, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

A jury found defendants Ulises Hernandez, Frank Rodriguez, Eddie Florentino and Carlos Almaraz guilty of, inter alia, kidnapping, raping, and attempting to murder Rosa C. They contend their convictions must be reversed due to instructional error, prosecutorial misconduct and insufficient evidence, but we disagree. Although the matter must be remanded due to some undisputed sentencing errors, we affirm the judgment in all other respects.

FACTS

On the night of May 6, 2009, Rosa and Almaraz were at a residence in Highland with several other people. During the course of the evening, Almaraz got into an argument with a woman named Tina over some drugs. He also introduced Rosa to Hernandez. Hernandez told Rosa he had a machine that could make gift cards and credit cards. Thinking she might be able to use the machine to commit identity theft, Rosa told Hernandez she was interested in buying it from him. They agreed to meet the following day so Hernandez could show her the machine.

The next day, late in the afternoon, Rosa and Hernandez met in Highland as planned. He told her the machine was just around the block, so she got into his car and they drove to a house a short distance away. However, at that location, Hernandez did not produce the machine. Instead, Rodriguez, Florentino and Almaraz entered Hernandez's car with Rosa. Noticing Rodriguez had a shotgun and Florentino had a handgun, Rosa became very scared. Although Hernandez told her not to worry, Rosa correctly intuited she was in grave danger.

As Hernandez began driving, Rosa's fear intensified as defendants began singing a song about a girl who was about to meet her doom. Their first stop was a Valero gas station in Redlands. While Hernandez was fueling his car, Rosa went into the restroom and tried to call her sister, but her cell phone died before she was able to secure her assistance. To make matters worse, defendants were waiting for Rosa when she stepped outside. She told them she didn't want to get back in the car, but they surrounded her, and Florentino flashed his gun, which was in his waistband. Upon seeing the weapon, Rosa got in the car with defendants, and they left the gas station.

As they were driving around, defendants accused Rosa of stealing drugs from them. Although it was untrue, they implied she and Tina had somehow snookered Almaraz in a drug deal. They wanted to know where Tina lived, but Rosa insisted she didn't know what they were talking about. During this time, defendants were passing around the shotgun, racking it, and talking about killing Rosa. They also passed around a handgun Hernandez had been carrying.

Eventually, Hernandez pulled into an orange grove off Pioneer Avenue in Redlands. He drove down a dirt road and stopped the car in a dark, secluded area. Defendants exited the car and ordered Rosa out of the vehicle. Then Rodriguez began loading the shotgun and said "let's see how far she gets before I shoot her." At that point, Rosa started to run. She didn't get far before she heard two shots and felt the sting of buckshot in her head, back and legs. She tried to keep running, but her body went numb, and she fell to the ground.

Almaraz found her first, and in an apparent attempt to protect her from further harm, he yelled out to the others that she had probably run to the freeway. However, Almaraz eventually showed Hernandez where Rosa was. Indifferent to her gunshot wounds, Hernandez told her to get up. Rosa said she was in too much pain to stand, but Hernandez, who was holding a handgun, told her he was going to shoot her if she didn't stand up. Despite the pain, Rosa got to her feet, and Hernandez walked her

3

over to his car at gunpoint.  Rosa made a desperate attempt to take Hernandez's gun, but he retained the weapon and hit her in the head with it.

The next thing Rosa remembers is hearing the voices of two men in the distance.  The men lived in a trailer in the orange grove, and upon hearing the gunshots, set out to see what was going on.  Before they got to Rosa's group, Hernandez remarked he might have to shoot them.  Thus, when the men approached and asked Rosa if she was okay, she lied and told them yes, so they would not get hurt.  As she hoped, the men took her answer at face value and walked away.

Defendants then put Rosa in the car and drove back to Highland.  Although Rosa was bleeding and pleading for medical help, they told her she didn't need any.  Hernandez parked in an alley and told Rosa he was going to kill her if she didn't take off her pants.  Fearing for her life, Rosa did as told.  Hernandez then ordered her to sit on Almaraz, meaning have sex with him.  After Almaraz unzipped his pants, Rosa sat on his lap, and he penetrated her vagina with his penis.  Then Hernandez ordered her to sit on Florentino's lap, which she did, and he raped her as well.

Hoping to end the ordeal, Rosa lied and said she saw a police car drive by.  Hernandez said it didn't matter, because they were probably going to kill her anyway.  He started driving again, and they ended up in front of his house on Cunningham Avenue.  However, seeing his neighbor was outside, he drove to an abandoned house in the area.  After pulling into the driveway, he ordered Rosa out of the car, and everyone else exited the vehicle, as well.  Rosa asked for her pants back, but Hernandez told her she wasn't going to need them.  Near a shed in the back of the house, he ordered her to orally copulate Florentino.  While she was doing so, Hernandez sodomized her from behind.

During these sex acts, Rosa began vomiting.  At that point, Hernandez told her to go inside the shed, but she made a run for it instead.  Despite being naked and

4

wounded, she managed to escape from defendants by running to a nearby house. A man at the house told her to go around back, and she hid there until the police arrived.

Forensic testing revealed the presence of sperm in Rosa's vagina and rectum. The DNA from the vaginal sperm matched Florentino and Almaraz's DNA, but there was insufficient material to conduct DNA testing on the rectal sperm. Testing also revealed Rosa had methamphetamine in her system at the time of the alleged offenses. She testified she hadn't used drugs for at least a couple of months.

Hernandez and Rodriguez were arrested the night of the offenses. When the police initially approached them and ordered them to stop, they were on foot near Hernandez's home. Before complying with the command, Hernandez tossed something into his car, and Rodriguez placed a bloody shirt on a nearby fence. Inside Hernandez's blood-stained car, investigators found a shotgun and a "speed loader" for a .44 caliber handgun. When Almaraz was arrested a few days later, he discarded a loaded .44 near a dumpster shortly before he was taken into custody.

Following a jury trial, defendants were convicted of attempted murder and four sex crimes while acting in concert: oral copulation, sodomy and two rapes. As to the attempted murder, the jury found Hernandez, Rodriguez and Florentino acted with premeditation and personally used a firearm, and Rodriguez personally discharged a firearm. The jury also found Hernandez personally used a firearm during each of the sex crimes.

In addition to the foregoing offenses, Hernandez, Rodriguez and Florentino were convicted of conspiracy to commit murder. Hernandez was also convicted of kidnapping to commit rape while personally using a firearm, and Rodriguez, Florentino and Almaraz were convicted of simple kidnapping.

The trial court sentenced Hernandez, Rodriguez and Florentino to indeterminate life terms, plus determinate terms. It sentenced Almaraz to 19 years and 8 months in prison. Although all four defendants appealed, Almaraz abandoned his appeal.

5

The remaining three defendants have joined each others' arguments to the extent they are applicable to them.

## I

Defendants contend the jury instructions at their trial were flawed in a variety of respects. Although they did not object to any of the jury instructions they challenge on appeal, we will entertain their claims nonetheless, because the instructions arguably infringed their right to a fair trial and because they claim their attorneys were ineffective for failing to preserve the instructional issues for appeal. (See *People v. Foster* (2010) 50 Cal.4th 1301, 1359, fn. 24; *People v. Crittenden* (1994) 9 Cal.4th 83, 146.)

However, in reviewing defendants' claim, we must keep in mind that jury instructions "'should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' [Citation.]" (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1111-1112.) We ""'"assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given. [Citation.]"'" [Citation.]" (*Id*. at p. 1111.) Unless there is a reasonable likelihood the jury misunderstood the challenged instruction in a manner that violated defendant's rights, we must uphold the court's charge to the jury. (*People v. Cain* (1995) 10 Cal.4th 1, 36-37.)

Defendants' initial instructional argument is that the trial court's instructions on rape in concert allowed the jury to convict them of that offense based on an invalid theory. We disagree.

Defendants were charged with committing both forcible rape and rape while acting in concert. The crime of forcible rape occurs when sexual intercourse is "accomplished against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another." (Pen. Code, §

6

261, subd. (a)(2).)[1]

The statute respecting sex crimes committed in concert is not limited to the crime of rape. It provides, "[I]n any case in which the defendant, voluntarily acting in concert with another person, by force or violence and against the will of the victim, committed an act described in Section 261 [rape], 262 [spousal rape] or 289 [sexual penetration], either personally or by aiding and abetting the other person, . . . the defendant shall [be imprisoned] for five, seven, or nine years." (§ 264.1.)

Under this statutory framework, force or violence is required for the crime of rape in concert, but it is not required for the crime of forcible rape. If the defendant, acting in partnership with another, accomplishes sexual intercourse against the victim's will by duress, menace, or fear of immediate bodily injury, he is guilty of forcible rape, but he is not guilty of rape in concert, absent the use of force or violence.

Defendants contend that, contrary to these principles, the trial court's instructions allowed the jury to convict them of rape in concert even if it found they did not use force or violence in raping Rosa. Here is what the jury was told:

Pursuant to CALCRIM No. 1001, the court instructed, "The defendants are charged with committing rape by acting in concert. [¶] To prove that a defendant is guilty of this crime, the People must prove . . . [t]he defendant personally committed forcible rape and . . . voluntarily acted with someone else who aided and abetted its commission [or] voluntarily aided and abetted someone else who personally committed forcible rape. [¶] To decide whether the defendants committed rape, refer to the separate instructions that I have given you on that crime. . . . You must apply [this separate] instruction[] when you decide whether the People have proved rape in concert." (See CALCRIM No. 1001.)

---

[1] All further statutory references are to the Penal Code.

7

The separate instruction on rape, CALCRIM No. 1000, explained, "The defendants are charged with rape by force. [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] The defendant had sexual intercourse with a woman; [¶] That he . . . and the woman were not married to each other at the time of the intercourse; [¶] The woman did not consent to the intercourse; [¶] And the defendant accomplished the intercourse by force, violence, duress, menace, or fear of immediate and unlawful bodily injury to the woman or to someone else." (See CALCRIM No. 1000.)

Defendants assert, "By introducing the more extensive means of committing the offense of rape through incorporation of the CALCRIM No. 1000 rape definition, the CALCRIM No. 1001 rape in concert instruction risks, and virtually invites, the jurors to erroneously find that rape in concert has been committed whenever a defendant commits rape within the meaning of section 261 and does so in conjunction with another. This is erroneous because rape under section 261 may be committed by means of duress, menace or fear of immediate bodily injury, whereas actual force or violence is required for the commission of rape in concert." At bottom, defendants fear the jury may have understood these instructions to mean force or violence is not required for the crime of rape in concert. However, we do not believe it is reasonably likely the jury construed the instructions in that manner.

CALCRIM No. 1001 informed the jurors that, in assessing whether defendants were guilty of rape in concert, they had to determine whether defendants committed "forcible rape." The instruction also told the jurors to look to CALCRIM No. 1000 for the definition of "rape." In so doing, CALCRIM No. 1001 signaled to the jury that the terms "forcible" and "rape" represented separate and distinct elements for purposes of rape in concert, even though force is one of the means by which rape may be committed. Indeed, CALCRIM No. 1000 defined rape as sexual intercourse that was accomplished by force, violence, duress, menace or threat of harm.

Nonetheless, by modifying the word "rape" with the word "forcible," CALCRIM No. 1001 made it apparent that the rape, no matter how it might be accomplished per the definition set forth in CALCRIM No. 1000, had to be "forcible" to constitute rape in concert. So even if the jury believed defendants were guilty of rape for overcoming Rosa's will by duress, menace or threat of harm, it could only have convicted defendants of rape in concert if it believed they used force in carrying out the rape. Given that the court's instructions made force a necessary condition for rape in concert, it is not reasonably likely the jury convicted defendants of that offense based on their use of duress, menace or threat alone.

II

In instructing on the crime of rape in concert, the court also told the jury "the People do not have to prove a prearranged plan or scheme to commit rape." Defendants contend that by telling the jury what was *not* required for rape in concert, this instruction was impermissibly argumentative and violated their right to due process and a fair trial. However, for purposes of explaining legal concepts to the jury, it is sometimes helpful to phrase things in negative terms. For example, the standard jury instruction on reasonable doubt states that the prosecution "need not eliminate all possible doubt" in order to meet its burden of proof at trial. (CALCRIM No. 220.)

In this case, the challenged instruction was legally correct. (*People v. Calimee* (1975) 49 Cal.App.3d 337, 341-342.) The fact it alerted the jury to something the prosecution was not required to prove is not grounds for reversal. (Cf. *People v. Gammage* (1992) 2 Cal.4th 693, 700-702 [upholding instruction that explains the state is not required to corroborate the victim's testimony in sex crimes cases].) The instruction did not lower the prosecution's burden of proof or violate defendants' rights in any fashion. (*Ibid.*)

9

## III

Next, defendants claim the jury instructions on attempted murder were so confusing the jury may have improperly convicted them of that offense based on the theory of implied malice. The claim is not well taken.

In instructing on attempted murder, the court stated the People must prove the defendants took a direct but ineffective step toward killing another person and they "intended to kill that person." Although this instruction conveyed the proper intent requirement for attempted murder, i.e., express malice, defendants submit that requirement was obscured by the court's instructions on conspiracy to commit murder.

Under those instructions, the prosecution had to prove, inter alia, "The defendant intended to agree and did agree with one or more of the other defendants to intentionally and unlawfully kill," and "[a]t the time of the agreement, the defendant and one or more of the other alleged members of the conspiracy intended that one or more of them would intentionally and unlawfully kill[.]" This language, too, properly conveyed the concept of express malice.

However, the court also told the jury, "The People must prove that the members of the alleged conspiracy had an agreement and an intent to commit murder." "To decide whether a defendant and one or more of the alleged members of the conspiracy intended to commit murder, please refer to the instructions which define that crime." The murder instructions explained, "Murder is a type of homicide. [¶] The defendants are charged with conspiracy to commit murder. To prove that a defendant is guilty of murder, the People must prove that: [¶] The defendant committed an act that caused the death of another person; [¶] And, when the defendant acted, he had a state of mind called malice aforethought.

"There are two kinds of malice aforethought: Express malice and implied malice. [¶] Proof of either is sufficient to establish the state of mind required for murder. The defendant acted with expressed malice if: [¶] He unlawfully intended to kill. [¶] The

defendant acted with implied malice if he committed an act; [¶] The natural and probable consequences of the act were dangerous to human life; [¶] At the time he acted, he knew his act was dangerous to human life; [¶] And, he deliberately acted with conscious disregard for human life."

As our Supreme Court has explained, "It is now well established that a specific intent to kill is a requisite element of attempted murder, and that mere implied malice is an insufficient basis on which to sustain such a charge. Accordingly, implied malice instructions should never be given in relation to an attempted murder charge. [Citations.]" (*People v. Lee* (1987) 43 Cal.3d 666, 670.)

Here, however, the implied malice instructions were not given in relation to the attempted murder charge. Rather, the court gave them long after the attempted murder instructions, while it was instructing on the conspiracy charge. And in so doing, the court made it a point to tell the jury that those instructions were applicable to the "charge of conspiracy to commit murder[.]" At no point was the jury ever told that it could convict appellants of attempted murder based on the theory of implied malice. Under these circumstances, it is not reasonably likely the jury applied the implied malice instructions in deciding whether defendants were guilty of attempted murder. (Compare *People v. Beck* (2005) 126 Cal.App.4th 518 [instructions on implied malice deemed to be error since they were given in connection with the attempted murder instructions and the prosecutor expressly relied on them in closing argument].)

In any event, by finding true the allegation defendants acted with premeditation and deliberation in attempting to kill Rosa, the jury necessarily determined they harbored the intent to kill. Therefore, any error in instructing on implied malice was surely harmless. (See *People v. Flood* (1998) 18 Cal.4th 470, 483, 506 [instructional error is generally not prejudicial if the jury necessarily resolved the underlying factual question against the defendant through other properly given instructions].)

In a somewhat related argument, defendants contend the court's instructions on conspiracy to commit murder were defective because they allowed the jury to convict them of that offense based on the theory of implied malice. While the conspiracy instructions were flawed in that regard, we do not believe defendants were prejudiced by them.

In *People v. Swain* (1996) 12 Cal.4th 593, the California Supreme Court held the crime of conspiracy to commit murder requires express malice, i.e., the intent to kill, "and cannot be based on a theory of implied malice." (*Id*. at p. 607.) Here, however, as we explained in the preceding section, the trial court directed the jury to utilize its instructions on murder in deciding whether defendants were guilty of conspiracy to commit murder. Because the murder instructions stated murder can be based on either express or implied malice, the court's instructions erroneously allowed the jury to convict defendants of conspiracy to commit murder based on the theory of implied malice.

Nevertheless, the error was harmless beyond a reasonable doubt under the circumstances presented in this case. There are several reasons why we believe the instructions on implied malice did not contribute to the jury's verdict on the conspiracy count.

First, although the conspiracy instructions were flawed for incorporating the instructions on implied malice murder, they also required the jury to find defendants intended to "intentionally and unlawfully kill." As the trial court explained, the intent to kill is the equivalent of express malice.

Second, at no point did the prosecutor argue that implied malice was a proper basis to support a conviction for conspiracy to commit murder. Rather, his theory of the case, as expressed throughout his closing argument, was that defendants specifically intended to kill Rosa. (Compare *People v. Swain, supra*, 12 Cal.4th at p. 607

12

[reversing conviction for conspiracy to commit murder where prosecutor improperly relied on implied malice theory].)

Third, the evidence of express malice was very strong. Defendants were armed with multiple weapons when they kidnapped Rosa and sexually assaulted her. They repeatedly talked about killing her and expressly threatened to take her life. And they drove her to a remote location and shot her in the head, back and legs. Although Rosa survived and was eventually able to make it to safety, defendants' words and actions demonstrate they possessed the intent to kill.

And fourth, the jury found defendants acted with premeditation and deliberation in attempting to kill Rosa. This finding is fundamentally inconsistent with the concept of implied malice, which assumes the defendant did *not* intend for his actions to result in death. (See *People v. Swain, supra*, 12 Cal.4th at pp. 602-603.)

For all of these reasons, we find the inclusion of instructions on implied malice to be harmless. The instructions do not warrant a reversal of defendants' convictions for conspiracy to commit murder.

V

Defendants' attack on the court's jury instructions is not limited to the instructions that were given. They also assert the court committed a prejudicial error of omission by failing to instruct the jury to consider their out-of-court statements with caution. (See CALCRIM No. 358.) This claim also fails.

During her testimony, Rosa described various statements defendants made to her during the course of the alleged crimes. For instance, she said Hernandez threatened to kill her and ordered her to have sex with the others, and Rodriguez wondered aloud how far she could run before he shot her. The Attorney General agrees a cautionary instruction was warranted in this situation. Indeed, "[i]t is well established that the trial court must instruct the jury on its own motion that evidence of a defendant's unrecorded, out-of-court oral admissions should be viewed with caution." (*People v.*

13

*McKinnon* (2011) 52 Cal.4th 610, 679.) The question thus becomes whether the failure to do so was prejudicial.

"Since the cautionary instruction is intended to help the jury to determine whether the statement attributed to the defendant was in fact made, courts examining the prejudice in failing to give the instruction examine the record to see if there was any conflict in the evidence about the exact words used, their meaning, or whether the admissions were repeated accurately. [Citations.]" (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1268.) Here, there was no conflicting evidence about the statements attributed to defendants. There was evidence Rosa had methamphetamine in her system at the time of the alleged offenses, which may have affected her ability to remember what defendants said, but the jury was instructed on the factors affecting witness credibility, including whether the witness has engaged in conduct that reflects on her believability. Therefore, it is unlikely the jury failed to subject Rosa's testimony to scrutiny. (*People v. Wilson* (2008) 43 Cal.4th 1, 20.)

The truth is, though, Rosa's testimony was amply corroborated by other evidence in the case. Surveillance cameras captured Rosa and the defendants pulling into the Valero station in Redlands. One of the men who lived in the orange grove described hearing gunshots and seeing Rosa with defendants. Rosa's injuries and the DNA evidence supported her version of events, and no one contradicted her version of the statements. All told, it is not reasonably likely defendants would have obtained a more favorable result had the court instructed the jury to view their out-of-court statements with caution. Therefore, its failure to do is not cause for reversal. (*People v. Clark* (2011) 52 Cal.4th 856, 957.)

## VI

Defendants' final instructional argument is that CALRIM No. 371, which allowed the jury to infer consciousness of guilt from the suppression of evidence,

"embodies an irrational permissive inference" in violation of due process. We are not persuaded.

The evidence showed that, right before they were apprehended by the police, Hernandez tossed something in his car, Rodriguez discarded a bloody shirt on a fence, and Almaraz surreptitiously placed a handgun near a dumpster. In light of this evidence, the trial court instructed the jury per CALCRIM No. 371, "If the defendant tried to hide evidence, that conduct may show that he was aware of his guilt. If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself. [¶] If you conclude that a defendant tried to hide evidence, you may consider that conduct only against that defendant. You may not consider that conduct in deciding whether any other defendant is guilty or not guilty."

Defendants object to the wording of the opening sentence of this instruction, in that it allowed the jury to infer they were "aware of" their guilt if they tried to hide evidence. Defendants acknowledge the predecessor to CALCRIM No. 371 — CALJIC No. 2.06 — has been approved by our Supreme Court. (*People v. Jackson* (1996) 13 Cal.4th 1164, 1224.) But they also note that CALJIC No. 2.06 used the phrase *consciousness* of guilt rather than *awareness* of guilt. (*Id*. at p. 1223, fn. 13.) Defendants argue "consciousness of guilt suggests a more generalized perception of guilt or responsibility, such as having a guilty conscience, which is distinguishable from [awareness of guilt, which connotes] an acknowledgment or acceptance of actual guilt for a criminal offense." In sum, they fear that, as worded, CALCRIM No. 371 left "no room for [a] conclusion [they were] not guilty," if the jury believed they tried to suppress evidence.

However, CALCRIM No. 371 empowers the jury to decide the "meaning and importance" of any suppression efforts. It also cautions that any attempt to hide evidence is not sufficient per se to prove guilt. This cautionary language benefited

15

defendants by "admonishing the jury to circumspection regarding evidence that might otherwise be considered decisively inculpatory. [Citations.]" (*People v. Jackson, supra*, 13 Cal.4th at p. 1224.)

In any event, we disagree with the underlying premise of defendants' argument that the phrase "awareness of guilt" is more incriminating than "consciousness of guilt." As the court in *People v. Hernandez Rios* (2007) 151 Cal.App.4th 1154 stated in examining the standard flight instruction (CALCRIM No. 372), there is no material difference between the phrases for constitutional purposes. (*Id*. at pp. 1158-1159.) Consistent with the court's ruling in *Hernandez Rios*, we reject defendants' claim CALCRIM No. 371 violated their right to a fair trial and due process of law.

VII

Turning their attention to the prosecutor's behavior, defendants contend the prosecutor committed prejudicial misconduct by referring to them as "animals" in his closing argument. We do not believe the reference warrants a reversal.

Toward the end of his closing argument, the prosecutor urged the jury to hold defendants accountable for their actions on behalf of Rosa. He told the jurors, "she just wants one thing from you. She wants the best thing you can give her, which is to ensure that every single [defendant] — and they are animals — [is held accountable] for what they did to her." No objection was made to this remark. In fact, during their closing arguments, the defense attorneys acknowledged Rosa had been subjected to horrible treatment during the alleged offenses.

Nevertheless, defendants now insist the prosecutor's description of them as animals crossed the line between legitimate advocacy and impermissible name calling. However, by failing to raise this argument below, defendants have forfeited their right to do so on appeal. (*People v. Green* (1980) 27 Cal.3d 1, 27.) Defendants claim it would have been futile for them to object because it would have been impossible for the trial court to cure the prejudice caused by the prosecutor's remark. However, we believe the

16

sting of the remark could have been alleviated by a simple reminder to the jurors that the defendants were human beings, not animals, and that no matter what they were accused of doing, or how the prosecutor described their actions, they were presumed innocent and entitled to a fair trial based solely on the evidence adduced at trial.

Even if the claim had not been forfeited, it would not carry the day.  "[A] prosecutor commits reversible misconduct [under California law] if he or she makes use of 'deceptive or reprehensible methods' when attempting to persuade either the trial court or the jury, and when it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted.  [Citation.]  Under the federal Constitution, conduct by a prosecutor that does not result in the denial of the defendant's specific constitutional rights . . . but is otherwise worthy of condemnation, is not a constitutional violation unless the challenged action '"so infected the trial with unfairness as to make the resulting conviction a denial of due process."'  [Citation.]"  (*People v. Rundle* (2008) 43 Cal.4th 76, 157, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390.)

Given the state of the record in this case and the overwhelming evidence that defendants subjected Rosa to a series of horrifically violent and debasing acts, we do not believe the prosecutor's reference to defendants as animals rendered their trial unfair in violation of due process, nor is it reasonably probable they would have obtained a more favorable result had the remark not been made.  Therefore, the remark is not cause for reversal.

VIII

We now take up defendants' sufficiency-of-the-evidence claims.  They first contend there is insufficient evidence to support the jury's find that, in attempting to kill Rosa, they acted with premeditation.  The record shows otherwise.

The standard of review for assessing the sufficiency of the evidence to support a criminal conviction is "highly deferential."  (*People v. Lochtefeld* (2000) 77

17

Cal.App.4th 533, 538.)  Our task is to ""examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence[.]""" (*People v. Alexander* (2010) 49 Cal.4th 846, 917.)  "Although we must ensure the evidence is reasonable, credible, and of solid value," we must keep in mind "it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends.  [Citation.]" (*People v. Jones* (1990) 51 Cal.3d 294, 314.)  "The conviction shall stand 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [it].""" [Citation.]" (*People v. Cravens* (2012) 53 Cal.4th 500, 508.)

The three categories of evidence traditionally deemed relevant to the issue of premeditation are:  (1) planning activity, (2) facts concerning the defendant's prior conduct with the victim, i.e., motive evidence, and (3) the circumstances surrounding the method of the killing or the attempted killing.  (*People v. Thomas* (1992) 2 Cal.4th 489, 516-517, citing *People v. Anderson* (1968) 70 Cal.2d 15.)  These categories are descriptive, not normative or exhaustive, and are intended "to aid reviewing courts in assessing whether the evidence is supportive of an inference that the killing [or attempted killing] was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse.  [Citation.]" (*People v. Perez* (1992) 2 Cal.4th 1117, 1125; see also *People v. Sanchez* (1995) 12 Cal.4th 1, 32-33, overruled on other grounds in *People v. Doolin, supra*, 45 Cal.4th 390, 421, fn. 22; *People v. Edwards* (1991) 54 Cal.3d 787, 813-814.)  We must remember "premeditation can occur in a brief period of time.  'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .' [Citations.]" (*People v. Perez, supra,* 2 Cal.4th at p. 1127.)

In this case, the defendants were armed with multiple weapons when they kidnapped Rosa.  After Rodriguez, Florentino and Almaraz entered the car with Hernandez and Rosa, defendants began singing a song about a girl being killed.

Suspecting Rosa had ripped them off in a drug deal, they also passed around the guns to each other, racked the shotgun and talked about killing Rosa. Then they drove her to a secluded orange grove, where Rodriguez prompted her to run and shot her in the head, back and legs. Hernandez also threatened to shoot Rosa at that location. And he threatened to kill her later on, while he was making his sexual demands. This evidence shows the prospect of killing Rosa was on defendants' minds throughout the ordeal. The drug deal provided the motive for murder, the weapons supplied the means, and the act of shooting Rosa shows defendants were serious about their threats.

Defendants claim the fact they had ample opportunity to end Rosa's life but did not actually do so shows they lacked the premeditative intent to kill. But it's not as though defendants voluntarily let Rosa go after deciding to spare her life. Rather, after the shooting in the orange grove, two men appeared and disrupted defendants' plan there. And after defendants sodomized Rosa later on, she had to make a daring escape in order to avoid further victimization. Based on all the evidence presented, the jury could reasonably conclude defendants harbored the premeditative intent to kill but were ultimately thwarted from murdering Rosa due to circumstances beyond their control. Their repeated murderous threats and their actions in shooting Rosa are highly indicative of a premeditative mindset. We are convinced there is substantial evidence to support their convictions for attempted premeditated murder.

IX

Defendants also challenge the sufficiency of the evidence to support their convictions for conspiracy to commit murder. However, the record contains substantial evidence of this offense, as well.

"'A conviction of conspiracy requires proof that the defendant and another person had the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense . . . .' [Citations.]" (*People v. Jurado* (2006) 38 Cal.4th 72, 120.) Thus, in the context of a conspiracy to commit

19

murder, the participants must agree to commit that offense and possess the specific intent to kill. (*People v. Cortez* (1998) 18 Cal.4th 1223, 1228.) Defendants contend there is insufficient evidence they came to an understanding to murder Rosa, but that is not the case.

To prove a conspiracy, it is not necessary to establish the parties met and expressly agreed to commit the target offense. (*People v. Vu* (2006) 143 Cal.App.4th 1009, 1025.) Instead, it will suffice if the evidence directly or circumstantially shows "the parties positively or tacitly came to a mutual understanding to accomplish the act and unlawful design." (*Ibid.*) Factors bearing on this issue include "'the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy. [Citations.]' [Citation.]" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1135.)

Here, it is evident the defendants knew each other and were working together when they tricked Rosa into getting in their car. They claim they only wanted to kidnap Rosa for the purpose of committing sexual crimes, not murder, but they were armed to the teeth, they talked about killing Rosa in the car, and the first thing they did when they got to the orange grove was shoot her in the head, back and legs. The sex crimes didn't occur until later, and even those acts were accompanied by murderous threats.

Moreover, while it is apparent defendants' actions were sexually motivated to some degree, that does not rule out the possibility of a murder conspiracy. In fact, the sex crimes arguably provided defendants with an even greater motive to kill Rosa, because she was the only person — other than defendants themselves — to witness those offenses. Viewing the evidence in favor of the judgment below, as we are required to do, we believe there is substantial evidence to support the jury's finding that defendants conspired to commit murder.

Defendants' sentencing claims are all that remain. They contend their sentences on some of the counts must be stayed pursuant to section 654. The Attorney General agrees, as do we.

"Section 654 precludes multiple punishment for a single act or omission, or an indivisible course of conduct." (*People v. Deloza* (1998) 18 Cal.4th 585, 591.) Whether a course of conduct is divisible depends on the intent and objective of the defendant. (*People v. Harrison* (1989) 48 Cal.3d 321, 335.) "[I]f all of the offenses were merely incidental to, or were the means of accomplishing or facilitating one objective, [the] defendant may be found to have harbored a single intent and therefore may be punished only once." (*Ibid.*)

The trial court sentenced defendants to 25 years to life for conspiracy to commit murder (count 2), plus a concurrent term of life with parole on the attempted murder count (count 1). The parties agree that because murder was the objective of the conspiracy, the concurrent sentences for attempted murder must be stayed under section 654. (*People v. Hernandez* (2003) 30 Cal.4th 835, 866, disapproved on another point in *People v. Riccardi* (2012) 54 Cal.4th 758, 824, fn. 32; *People v. Ramirez* (1987) 189 Cal.App.3d 603, 615-616.) The parties additionally agree that because the sentences for attempted murder were imposed concurrently, the enhancements attendant to that count for personal use of a firearm must be imposed concurrently, as well. (*People v. Bui* (2011) 192 Cal.App.4th 1002, 1016; *People v. Mustafaa* (1994) 22 Cal.App.4th 1305, 1311.)

It is also undisputed that section 654 applies to Hernandez's sentences for rape in concert (counts 11 and 12) because those offenses were part and parcel of his conviction for kidnapping to commit rape (count 3). (*People v. Latimer* (1993) 5 Cal.4th 1203, 1216-1217.) And that Rodriguez and Florentino's sentences for kidnapping (count 4) must be stayed because they committed that offense for the purpose of committing the

21

sex crimes and the attempted murder. (*Ibid*.) Because the trial court failed to take account of section 654 in this regard, we will reverse defendants' sentences and remand the matter for resentencing.

Defendants ask that we simply modify their sentences without remand. However, it is unclear how the trial court arrived at its sentencing decision on some of the counts, and the abstract of judgment does not accurately reflect the trial court's sentencing decision on all of the counts.[2] Considering, as well, defendants' sentences must be corrected to comport with section 654, we believe the proper remedy is to remand the matter for resentencing. (*People v. Austin* (1981) 30 Cal.3d 155, 160-161; *People v. Delgado* (2010) 181 Cal.App.4th 839, 855.)

## DISPOSITION

Defendants' sentences are reversed and the matter is remanded for resentencing. Following resentencing, the clerk of court shall prepare an amended abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.


BEDSWORTH, ACTING P. J.

WE CONCUR:


IKOLA, J.


THOMPSON, J.

---

[2] For example, the trial court sentenced Rodriguez to a determinate term of 19 years, but the abstract of judgment lists his determinate sentence as 28 years and 8 months.

22